# EPHRAIM SAVITT
*Attorney at Law*

260 MADISON AVENUE
SUITE 2200
NEW YORK, NEW YORK 10016

(212) 679-4470
FAX: (212) 679-6770
EPHRAIM@SAVITTESQ.COM

April 17, 2011

*COURTESY COPY-ORIGINAL BY MAIL & ECF*

Honorable Dora L. Irizarry
U.S. District Judge
U. S. District Courthouse
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: **United States v. Saka Oladejo and Rashidat Oladejo
Assigned Docket No. 10 CR 549 (DLI)**

Dear Judge Irizarry:

I respectfully submit this sentencing submission on behalf of my client Rashidat Oladejo in order to set forth mitigating factors for the Court to consider in evaluating my application for a non-jail sentence where by she can continue to care for her young children. Because the sentencing factors for Rashidat are largely applicable to her husband and co-defendant Saka Oladejo, most of the points discussed in this submission are equally applicable to both. The arguments below are premised on a combination of the mitigating factors that, in turn, support a combination of a Guidelines downward departure below the applicable advisory sentencing range of 18 to 24 months and a downward variance pursuant to the statutory sentencing factors set forth in 18 U.S.C. §3553 (a) and articulated in, among others, the United States Supreme Court's opinion in <u>Spears</u> v. <u>United States</u>, 129 S. Ct. 840 (2009) (per curiam). Specifically, I respectfully urge the Court to impose a probationary period for my client Rashidat Oladejo, or alternatively, a home confinement term.

### a. The Mitigating Factors That Support Non- institutional Confinement:

The Presentence Report ("PSR") Recommendation is that both Saka and Rashidat be sentenced to 1 year and 1 day in custody, an order of restitution of $304,424, payable at the rate of 25% per quarter while in custody, and at a rate of 10% of gross income per month while on supervised release, plus 3 years supervised release and a $100.00 special assessment. The PSR Recommendation adds that "the Court may impose staggered sentences for the [defendants]..., which would allow for [their two adopted children from Nigeria, a daughter age 6 and a son age 4] to remain in the custody of one parent until both sentences are served." (Id. at page 1, top paragraph, and under Comments in last sentence in second paragraph). I respectfully take issue with that recommendation, based on 6 categories of ameliorating factors, as discussed below, which support both a downward adjustment under the Guidelines and a downward variance under the statutory sentencing factors in §3553 (a).

There is no good reason why the "parsimony clause" of §3553 (a) that directs sentencing courts to impose punishment that is "sufficient but not greater than necessary punishment" to accomplish the statutory sentencing goals cannot be satisfied by the imposition of non-incarceration sentences both for my client Rashidat and her husband Saka. In view of the economic difficulties facing the Oladejos (as set forth in the PSR and below), I respectfully ask the Court to set the restitution payment schedule at the rate of 10% of his/her gross monthly income, with a waiver of an interest requirement, until the full amount owed to IRS is repaid.

### 1. Parental Responsibilities:

No purpose is served whereby two adopted children of such tender years, as the Oladejo children, must be deprived of even one parent for months at a time. There simply is no surrogate caretaker in this country that can provide the kind of care and attention as their adoptive parents

have been providing to these previously abandoned African children, who will be lost without the love of the only parents they know.

The factor of the children's needs is neither contrived nor trivial. As the PSR recites in part (at page 9, paragraph 33), Saka and Rashidat, who have no biological children, adopted their daughter Khadijat Abeni Oladejo, who is 6 years old, several days after her birth in Nigeria in 2004 from an orphanage in that country. She had been abandoned in the bush, before being discovered, and has no idea that she is not the Oladejos biological child. Their little boy Sadiq, also abandoned by his natural parents and in a Nigerian orphanage, was adopted by the Oladejos in January 2007 when he was a 6-month old orphan. It took several years to complete the U.S. immigration process and Sadiq was cared for and sent to school by relatives in that country. In fact, Sadiq was brought to the U.S.A. on an immigrant visa by Rashidat on the morning of her arrest, August 13, 2010. Saka, who had already been arrested on the charges in this case, decided that he did not want Rashidat -- then in Africa to complete Sadiq's adoption process and to take the child to America -- to become distraught because of the criminal case.

With the kind assistance of AUSA Winston Paes and the federal agents in this case, Saka was permitted to be at JFK Airport to "soften the blow" of Rashidat's arrest and take home little Sadiq, who, thankfully was too young to remember under what circumstances he immigrated into our country. Rashidat was released on bail later that day to be reunited with Saka and their 2 young children. She and Saka have continued to raise them and provide them with a secure and nurturing environment, while, at the same time, dealing with the pressures of their criminal prosecution and dwindling economic condition.

Although there are some family members in this country, most of the others are in Nigeria. None of their relatives in this country, as the PSR reports, is financially able or emotionally capable of taking care of the Oladejo children. These children of tender years,

abandoned early in life by their natural mothers, have been given a loving and caring home by the Oladejos. It does not require the expert testimony of a child psychologist to conclude that the absence for 10 months (as per the PSR recommendation and the BOP 15% good time credit) even of one parent, will be nothing short of emotionally devastating for Oladejos' 6 year old daughter and 4 year old son. Certainly, concurrent or successive 10-month absences of both parents will cause exponentially greater emotional harm to the children.

Please permit me to speak for one moment as a parent of 4 children, now much older than the Oladejo children. Having seen the interaction of the children with their parents, I admire the parenting qualities that Rashidat and Saka exhibited and am supremely impressed by how well-behaved and genuinely happy the children are.

This is not a case where individual or institutional victims exist that have suffered irreparable harm as a result of the offense conduct. That would weigh in favor of incarceration despite collateral damage to children of defendants. To the contrary, restitution at a reasonable and doable rate to both federal and state taxing authorities would render this case victimless.

## 2. Immediate Acceptance of Responsibility:

Another significant personal mitigating factor is the literally immediate acceptance of responsibility by both Saka and Rashidat as to their offense conduct. Added to that is their true contrition and regret as to their offense conduct and their determination, as Saka Oladejo reported to Probation Officer Espinoza, to accelerate restitution to the IRS. They intend to sell their family home, which has been already listed for sale, and move to a less expensive rental, in order to turn the net proceeds of the sale over to the IRS as a lump sum portion of their payment for the taxes they owe.

The PSR comments (on page 21, paragraph 1) that the Court may consider "as an aggravating factor" that Saka and Rashidat had not reported their true income for 2003 and 2004

on their New York State income tax returns. The PSR reasons that, as a result, "the amount of the tax loss to the State is unknown, [and] it could not be included in the guideline calculation." Although technically correct, that assertion is superficial. The government was able to figure out Saka and Rashidat's joint federal underreporting. Given that the state's tax obligations are an adjunct of the federal tax computation for the state taxes owed, a competent accountant, whether private or government, can very well come up with an estimated formula. In fact, given that the federal tax loss is slightly over $300,000, Guidelines level 15, premised on a total tax loss of between $200,000 and $400,000, would almost certainly not have been exceeded had the state tax loss been computed. Saka and Rashidat have retained a tax preparer to compute the state tax owed and to file amended returns, both federal and state, for 2003 and 2004, based on the government's unchallenged underreporting figures.

### 3. The tax violations represent aberrant behavior in otherwise law-abiding lifestyles:

Neither Saka nor Rashidat has a prior criminal record and neither has had any experience, even on the lowest level, with the criminal justice system, either in this country or their native Nigeria. Indeed, both Saka and Rashidat have been broken in spirit since the criminal case was filed against them. Their contrition for their tax offenses is genuine, not simply because they were caught, but because they have been stigmatized perpetually as criminals, yet had never committed criminal offenses previous or subsequent to the 2003-2004 time period or, for that matter, any other criminal conduct during that period. As such, their joint false tax returns for 2003 and 2004 represent aberrant behavior for them in otherwise productive and law-abiding lives. Only truly caring persons would go through so much difficulty and effort in adopting two beautiful African children, abandoned as infants by their biological parents, and to undertake to love and raise those babies as their own in order to give them a solid foundation to become successful and productive adults in this country.

Certainly, Saka and Rashidat committed serious wrongs by underreporting a substantial amount of income for 2003 and 2004. As a budget analyst since 1989 for the NYC Administration of Children's Services (ACS/Head Start"), Saka supplemented his income by operating Ishaja Enterprises, a wholly-owned company that at various times provided tax preparation, security and laundromat services, during the period 2002 to 2009. Ishaja Enterprises was a perfectly lawful business, but for the underreporting by Saka on the 2003 and 2004 tax returns of Ishaja's income for providing security services to Mosaic Contractors, Inc., a company owned jointly by him and Rashidat. Mosaic was operated by Rashidat in the period 1993 to 2006, and had provided interior design and construction services as a general contractor for ACS/ Head Start facilities.

Rashidat's otherwise unblemished lifestyle was marred by her use of two social security numbers in connection with the 2003 and 2004 tax offenses. Her legal social security number is in her legally-changed married name. The other had been provided to her years earlier by a college friend who fortuitously shared Rashidat's birth name "Lisa Bailey," and allowed her to use her identification in connection with Rashidat's registering as a student at the Fashion Institute of Technology. Rashidat assisted in not reporting income by issuing checks in the name "Lisa Bailey" to Ishaja Enterprises, although these were payments for actual security guard services rendered to Mosaic's ACS/Head Start construction sites. ACS/Head Start check payments to Mosaic, although for actual work performed, were also not fully reported, which is why they are before the Court for sentencing. But there is no assertion of payments for work not actually performed. In fact, such an assertion would have no factual basis.

To our best information and belief, the PSR's assertion (on page 4, paragraph 5, line 6) that checks were issued by ACS/Head Start to "Lisa Bailey" is not accurate. According to our records, all of the ACS/Head Start check payments, but for one to "Lisa Bailey", were made

payable and addressed to Mosaic and were for actual work performed. The problem, of course, was that not all those check payments were reported in the 2003 and 2004 tax returns.

### 4. The Adverse Consequences of the Defendants' Convictions:

In addition to the civil disabilities that felony convictions will create for Saka and Rashidat –which include the requirement that they disclose their convictions on all employment and loan applications and cannot obtain certain licenses from state regulatory authorities, such as real estate, brokerage and liquor licenses for restaurants – Saka's employment with ACS/Head Start may very well be in jeopardy as a result of his conviction even if he does not serve prison time. As a trained accountant, Saka will probably be able to find alternative employment, should he lose his present job, but given the disclosure requirements for new job applications and the uncertain economy, that will likely not come readily. His other business Ishaja Enterprises has already ceased operating as a result of the investigation that led to this case. Rashidat had been making some little money in real estate brokerage. But her Mosaic business was also shut down in the aftermath of the investigation. It is virtually certain that she will be faced with difficulties in reconstructing her ability for self-employment as a result of the loss of her Mosaic interior decorating and contracting business which, in turn, was dependant, in large measure, on ACS/Head Start contracts.

Parenthetically, those contracts were almost always awarded to Mosaic where a prior contractor for ACS had failed to perform and the agency turned to Rashidat because she was willing to accept projects undesirable to larger contractors. The Oladejos have always worked hard and earned what they were paid.

The loss of business and the prospect of a very hard economic road ahead for the Oladejos provide a double-pronged basis for the application of leniency to keep them out of a prison environment, even for a short time period. First, the loss of business opportunities and

income is an incidental, yet very tangible, punishment and deterrence factor. Second, for the Oladejos, whether they are sentenced to probation or home confinement, the fact that they they have felony convictions and the strictures of probationary or home confinement non-prison sentences, will afford a true measure of punishment, while concomitantly allowing them rehabilitation and employment in order to support themselves and defray the expenses of caring for and raising their two youngsters. In Saka's case, staying out of jail is the only way he may be able to keep his present job, which he has performed well for many years, and not forfeit his pension. A prison term will mean the loss of both. As to Rashidat, staying out of prison will allow her to seek and maintain employment supplement Saka's income. In turn, continued employment will enable the Oladejos to pay down their tax liabilities to the IRS and New York State.

### 5. Rashidat's Health Challenges:

In addition to the foregoing mitigating factors, Rashidat has a combination of medical infirmities that militate against the imposition of an institutional confinement sentence. As the PSR correctly sets forth (at pages 10-11, paragraphs 39-41), with the corroboration of medical records submitted to the Probation Department, Rashidat has suffered from a variety of ailments for the past 18 years. She has a sluggish thyroid condition that has required regular daily medication for the past 16 years. She has had a malignant breast lump removed, as well as stomach ulcer fibroids. She suffers from achalasia, an esophageal disease that causes difficulty swallowing liquids and solids. That has required a painful surgical esophagus stretching procedure a few years ago and may require another such procedure should her condition worsen. She has also had two painful knee surgeries as a result of an auto accident, which has hampered her mobility permanently. Most recently, she was hospitalized at the end of February to the first week in March for the treatment of pneumonia.

In short, Rashidat is not medically well and her physical frailty makes her prone to bouts of illnesses, including her recent serious pneumonia that kept her hospitalized for nearly a week. An institutional confinement setting would only exacerbate her already difficult health problems, and for no good cause that would promote any of the statutory sentencing goals.

## Other Factors in the Oladejos' Backgrounds:

Under separate cover, counsel will submit a number of character reference letters on behalf of Rashidat and Saka from family, friends, clergy and beneficiaries of their personal and private acts of kindness to others, including total strangers. The letters will attest to, among other good deeds, that Saka and Rashidat opened their home to follow Nigerians and their families who were immigrating to or visiting this country, without accepting any payment for the expense involved; are God fearing adherents of the Islamic faith who regularly attend services and contribute, both of their time and limited funds, to charity and the upkeep of their house of worship; are devoted to each other and members of their respective families, often giving of themselves and their limited funds to help relatives and friends; and, most significantly, are perhaps two of the best parents in our community, whose lives have been dedicated to raising and caring for their adopted children.

These background factors speak far more about the kind of persons the Oladejos are than their admitted offense of conviction. Those qualities further militate against sentences of incarceration for these genuinely good people.

### b. Legal Discussion - The § 3553(a) factors:

We respectfully ask the Court to take into account the compelling personal mitigating factors set forth above for my client Rashidat Oladejo, as well as for her husband Saka, both under the Guidelines and the § 3553 (a) criteria, that will afford adequate punishment, individual and general deterrence, protection of the public and respect for the law, while at the same time

allowing them to care for their young children and promoting their rehabilitation by continuing to be productive and industrious and <u>completely</u> law-abiding citizens. The requested non-incarceratory sentences are best suited, we respectfully suggest, to accomplish all of the sentencing goals, including full rehabilitation.

Following the United States Supreme Court's decision in <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005), and the Second Circuit's interpretation of <u>Booker</u> in <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103 (2d Cir. 2005), this Court's sentencing decision no longer is limited to the non-mandatory Guidelines, but instead must be governed by factors listed in 18 U.S.C. §3553 (a). Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the Guidelines range and any applicable Guidelines Policy statements and departure grounds.

This Court must consider all of the applicable §3553(a) factors to derive a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. <u>See</u> <u>United States</u> v. <u>Ministro-Tapia</u>, 470 F.3d 137 (2d Cir. 2006) (analyzing the "parsimony clause" of 18 U.S.C. §3553(a)). It is respectfully submitted that under these standards, a non-Guidelines reduced sentence, taking into account the § 3553(a) factors and the <u>Spears</u> rationale, is appropriate.

Although, to be sure, sentencing courts are still required to "consider" the Guidelines, the U.S. Supreme Court has continually eviscerated the significance of the Guidelines in arriving at a "reasonable sentence." In <u>Nelson</u> v. <u>United States</u>, 129 S.Ct. 890 (January 26, 2009) (<u>per curiam</u>), the Court made it clear that "the Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed reasonable</u>," slip. op. at 3 (emphasis in original).

Accord, Rita v. United States, 551 U.S. 338 (2007), in which the Court explicitly stated that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." Id. at 351. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court provided similar guidance that in evaluating how the various §3553(a) sentencing factors apply to individual defendants, a sentencing court "may not presume that the Guidelines range is reasonable," but instead "must make an individualized assessment based on the facts presented". Id. at 43. This reasoning was the basis for the Supreme Court's recent holding in Spears v. United States, supra, that a district court may vary from the crack cocaine Guidelines based solely on a "policy disagreement" with them, and not simply based on an "individualized determination" that they yield an excessive punishment in a particular case. Similarly, in Kimbrough v. United States, 552 U.S. 85 (2007) the Court held that "a district court may consider arguments that the Guidelines sentence itself fails properly to reflect §3553(a) considerations." Accord, Rita, 551 U.S. at 351.

Following the post-Booker Supreme Court refinements of a district court's discretion as the weight to be accorded to a prescribed Guidelines sentencing range in evaluating the §3553(a) factors, the Second Circuit has affirmed substantial sentencing variances from advisory Guidelines ranges as properly within the broad sentencing discretion to be accorded to district courts. See, e.g., United States v. Cavera, 550 F. 3d 180 (2d Cir. 2008) (en banc) (deferring to the sentencing court's expertise in deciding the appropriate factors on which to base its sentencing calculus, in that case on "policy" considerations of needed deterrence for firearms possession); United States v. Adelson, 301 F. Appx. 93 (2d. Cir. December 9, 2008), aff'g, United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (affirming district court's substantial downward variance in sentencing from the advisory Guidelines life sentence in a stock fraud case where shareholders lost over $50 million because of the unfair "multiplier

effect" that losses in a publicly traded stock generated and the individualized mitigating factors in the defendant's role in the office, his background and family life). Accord, United States v. Regalato, 518 F.3d 143, 147 (2d Cir. 2008); United States v. Fleming, 397 F.3d 95, 100 (2d Cir. 2005) (eschewing appellate "micromanagement" of the sentencing process because of the broad powers of the district court in weighing the statutory sentencing factors).

The combination of extenuating personal factors in Saka and Rashidat Oladejo's personal backgrounds, family circumstances, otherwise exemplary lifestyles, especially their selfless adoption of abandoned African children from orphanages to provide them with a meaningful future in our country, as set forth in the PSR and in this submission, militate strongly in favor of keeping them at home to care for their children and maintain employment to keep them self-sufficient. Similar and even less compelling circumstances have persuaded sentencing counts in this circuit to implement significant sentencing reductions from the advisory Guidelines ranges. See, e.g., United States v. Parris, 05 CR 636 (FB) (E.D.N.Y. August 14, 2008) (drastically reducing sentence from Guidelines range in a fraud case because the "absolute arithmetic" of the applicable Guidelines would have unfairly magnified punishment for defendants who were not in "the same league as the likes of the Enron, WorldCom and Computer Associates defendants"); United States v. Hardy, 07 CR 906 (JBW), 2008 WL 2965816 (E.D.N.Y August 4, 2008) (declining to follow Guidelines' commentary regarding application of firearms enhancement as "unreasonable"); United States v. Kon and United States v. Cheah, 04 CR 271 (RWS), 2006 WL 2108555 (S.D.N.Y November 2, 2006) (non-custodial sentences imposed on two narcotics defendants, representing significant reductions from Guidelines ranges based on a combination of factors, including "extraordinary family circumstances," which, as to one defendant, was the finding that she was the sole caretaker of her 2-year old daughter); United States v. Aristizabal, 07 CR 101 (JBW), 2007 WL 4555900 (E.D.N.Y. December 20, 2007) (imposing a substantially

below Guidelines sentence for drug distribution because of the defendant's "good relationship with his wife and children and his efforts to support them"); United States v. Jimenez, 07 CR 92 (JBW), 2007 LW 3010625 (E.D.N.Y. October 11, 2007) (drastic downward variance from narcotics Guidelines range because of the defendant's "family circumstances," including his support of his wife and child and the child's reported emotional reliance on him).

The compelling extenuating factors in the Oladejos' case, as discussed above, support a downward adjustment in the advisory Guidelines calculus and the application of a non-Guidelines downward variance under the § 3553 (a) factors and the Spears formula. Such "individualized" sentences will serve to implement the sentencing goals of deterrence and respect for the law, without the need for segregating either Rashidat or Saka from society and separating them from their children. At the same time, mandating full restitution to the IRS and the New York State Tax Authority will more than amply assure that they have not only rehabilitated themselves, but have paid back every dime they owe to the federal and state governments. Finally, keeping the Oladejos employed will serve the dual purpose of supporting their children and having the means to pay restitution for their offense in affordable installments of their gross monthly income.

For all these reasons, I respectfully ask this Court to impose non-incarceration sentences for the Oladejos and to allow them to care for their young children, continue their rehabilitation and employment and enable them to pay the taxes owed to the IRS and the New York State.

Respectfully submitted,

Ephraim Savitt, Esq.

Cc: AUSA Winston Paes
    Michael Padden, Esq.
    P.O. Michelle Espinoza
    Rashidat Oladejo
    Saka Oladejo

*Honorable Dora L. Irizarry*
*April 17, 2011*
*Page 14*